**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| GATEWAY CLIPPERS HOLDINGS LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: |
| v. | ) | |
| | ) | |
| WEST BEND MUTUAL INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendant. | ) | |

## PLAINTIFF'S COMPLAINT

# TABLE OF CONTENTS

I.   NATURE OF THE ACTION ............................................................................ 1

II.  THE PARTIES............................................................................................. 3

III. JURISDICTION AND VENUE ...................................................................... 5

IV. FACTUAL ALLEGATIONS .......................................................................... 6

    A.   The Global COVID-19 Pandemic ............................................... 6

    B.   Steps Taken by Authorities T\to Control The Pandemic ................ 8

    C.   The Damaging Impact of the Covid-19 Pandemic on Plaintiff.................... 10

    D.   Plaintiff's Business Insurance Policies with Defendant................ 12

    E.   Defendant' Efforts to Discourage Insureds from Making Claims Despite Knowing That It Will Have to Pay Them ................ 21

V.  JURY DEMAND ......................................................................................... 26

COUNT I: BUSINESS INCOME BREACH OF CONTRACT................ 26

COUNT II: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING APPLICABLE TO BUSINESS INCOME ............ 27

COUNT III: DECLARATORY RELIEF ................ 29

COUNT IV: EXTRA EXPENSE BREACH OF CONTRACT................ 30

COUNT V: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING................ 30

COUNT VI: DECLARATORY RELIEF ................ 32

PRAYER FOR RELIEF ................ 36

PLAINTIFF GATEWAY CLIPPERS HOLDINGS, LLC brings this action for breach of contract, breach of the covenant of good faith and fair dealing, and declaratory and injunctive relief against WEST BEND MUTUAL INSURANCE COMPANY demanding a trial by jury. Plaintiff makes the following allegations based upon information and belief, except as to those allegations specifically pertaining to Plaintiff, which are based on personal knowledge.

## I.   NATURE OF THE ACTION

1.   Gateway Clippers Holdings LLC ("Gateway Clippers" or "Plaintiff"), owns and operates 20 franchised Great Clips hair salons in the St. Louis metropolitan area, both in Missouri and Illinois. To provide protection in the event of a catastrophic event beyond its control, Gateway Clippers purchased a business insurance policy from Defendant West Bend Mutual Insurance Company ("West Bend" or "Defendant"). That policy promises to indemnify the policyholder for actual business losses incurred when business operations are involuntarily suspended, interrupted, or curtailed because of direct physical loss of or damage to its property. This coverage, commonly known as "business interruption" or "business income" coverage, is standard in most all-risk commercial property insurance policies.

2.   Insurance is a way to manage risk, providing protection from financial loss. It is especially appropriate – indeed, vital – for protection against losses that, while unlikely and unexpected, would be financially devastating if they occur. To protect itself from just such a disaster, Gateway Clippers purchased business insurance, including business interruption coverage, from Defendant beginning on February 28, 2020. (Ex. A and Ex. B hereto).

3.   Then in March 2020, something unexpected happened, perhaps the ***most*** unexpected event to hit the United States in the lifetimes of everyone alive today. It was the worst health crisis in this country, and indeed the world, in over a century, a worldwide pandemic of a disease called COVID-19 that caused massive illness and death.

1

4.   As a result of the pandemic and to protect against its spread, on March 16, 2020, the White House advised all Americans: "Do not go to work. Do not go to school."[1]

5.   A few days later, the Missouri Counties where Plaintiff has its salons issued Stay at Home Orders that did not allow hair salons to stay open. The State of Missouri followed on April 3, 2020. The state of Illinois issued a similar order on March 20.

6.   As a result of the risks of staying open during the COVID pandemic, as well as the government orders, Gateway Clippers closed all of its Missouri and Illinois salons between March 18 and 20 and kept them closed for up to two months. Even afterward, the need to social distance has caused Gateway Clippers to be unable to serve its accustomed number of customers and therefore to suffer continued losses. Plaintiff has also had to incur extra expenses for items necessary to keep the salons open, such as plexiglass dividers, masks and extra cleaning supplies.

7.   However, Defendant refuses to comply with its obligation to cover Gateway Clipper's business income losses and covered expenses.

8.   In response to Plaintiff's claim, Defendant blatantly misinterpreted the Policy's Business Income coverage as requiring "direct physical loss or damage to the property." The Policy covers "physical loss *of* or damage to property, a difference that is critical because Plaintiff suffered a "loss of" its property when the pandemic rendered it unable to use its property as a hair salon.

9.   One of the grounds on which Defendant based its denial was the Policy's Virus Exclusion. However, it based that denial on an astounding misapprehension that COVID-19 – which it admits is the cause of Plaintiff's business interruptions – is a virus. It is not a virus. It is a disease, one that is caused by a virus.

---

[1] https://www.reuters.com/article/health-coronavirus-trump-guidelines-idUKL1N2B95Q1 (accessed 10/26/2020).

10. The Virus Exclusion excludes from coverage losses that are directly caused by a ***virus*** where there is no other cause or event that contributes concurrently or in any sequence to the loss. Plaintiff's claim had asserted that its losses were caused by the COVID-19 pandemic, not the virus.

11. Any causal relationship between the virus and Plaintiff's losses is indirect (the virus caused COVID-19, which resulted in the pandemic, which caused Plaintiff to close its salons) and occurred in addition to other causes, namely the COVID-19 disease, the pandemic and government closure orders. By misinterpreting COVID-19 as a virus, Defendant erroneously found a direct causal relationship between COVID-19 and Plaintiff's losses in the absence of other causes.

12. Gateway has therefore been forced to bring this lawsuit to obtain the coverage for which it obtained its Policy – indeed, to look for the silver lining that West Bend promises.

## II.  THE PARTIES

13. Gateway Clippers Holdings LLC is a Missouri Limited Liability Corporation with its headquarters at 165 N. Meramec Ave., Suite 500, St. Louis, MO 63105, where management decisions are made. It owned and operated 20 franchised Great Clips hair salons in both the Missouri and Illinois portions of the St. Louis Metropolitan Area. It purchased Policy Number: A730680 00 from Defendant, with a policy period of February 28, 2020, through July 5, 2020, and Policy Number A730680 01, with a policy period of July 5, 2020, through July 5, 2021. (Ex. A at 2.)

14. West Bend Mutual Insurance Company is an insurance company organized under the laws of the State of Wisconsin with its principal place of business at 1900 South 18th Avenue, West Bend, WI 53094. It is regulated by the Missouri Department of Insurance.

3

15. West Bend's slogan is, "West Bend Provides a Silver Lining. T*he worst brings out our best*," as shown on the home page of its website, thesilverlining.com:[2]



16. As West Bend knows, "[a] silver lining is a sign of hope or a positive aspect in an otherwise negative situation. The phrase is often seen as part of the proverb 'Every cloud has a silver lining,' meaning that there's hope or something good to be found in every bad situation."[3] But as shown herein, West Bend's slogan is misleading. If it provides a silver lining, it is a silver lining covered in clouds.

17. One of the types of businesses for which West Bend claims to provide the silver lining is hair salons like Gateway Clippers. As it tells them, as important as it is for salons to "focus on delighting your customers, it's equally important to make sure your business is protected should something unexpected happen"[4]:

---

[2] https://www.thesilverlining.com/  (italics in original; accessed 11/3/2020).
[3] https://www.google.com/search?q=silver+lining&oq=silver+lining&aqs=chrome..69i57j46i433j0i433j0l2j0i433l2j0.2945j0j15&sourceid=chrome&ie=UTF-8 (accessed 11/3/2020).
[4] https://www.thesilverlining.com/business-insurance/types-of-business-we-insure/health-beauty-fitness (accessed 11/3/2020.



### III. JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(1) because the matter in controversy exceeds $75,000, exclusive of interests and costs and there is complete diversity between the parties.

19. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part, if not all, of the acts and omissions complained of in this action took place in this district.

20. The facts alleged herein show that the Court has specific personal jurisdiction over Defendant.

# IV. FACTUAL ALLEGATIONS

## A. The Global COVID-19 Pandemic

21. According to the World Health Organization ("WHO"), COVID-19 is an infectious disease for which there are no vaccines or treatments.[5] It spreads easily from person-to-person.[6]

22. When an infected person coughs, sneezes, or even just talks, droplets with the infectious agent, a virus known as coronavirus or SARS-CoV-2, fly into the air from the person's nose or mouth and can thereby infect others. This can occur even if the person is asymptomatic.[7] As WebMD states, "Some people who don't know they've been infected can give it to others. This is called asymptomatic spread. You can also pass it on before you notice any signs of infection, called presymptomatic spread."[8]

23. Thus, there is no way to know whether a person with whom one comes into contact might be spreading the disease.

24. The coronavirus can live in the air for up to three hours, be breathed in by others, and get into their lungs, where it can infect them.[9]

25. The coronavirus can also infect people who touch surfaces, such as countertops, furniture, doorknobs and other surfaces in a facility like Plaintiff's if it contains the virus. It can live on plastic and stainless steel for up to three days.[10]

---

[5] https://www.who.int/health-topics/coronavirus#tab=tab_1 (accessed 10/26/2020).
[6] https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html#:~:text=On%20March%2011%2C%20the,of%20new%20influenza%20viruses. (accessed 10/26/2020).
[7] https://www.webmd.com/lung/coronavirus-transmission-overview#1 (accessed 10/26/2020).
[8] *Id.*
[9] *Id.*
[10] *Id.*

26. According to the Centers for Disease Control, COVID-19 can cause mild to severe symptoms, such as cough, shortness of breath or difficulty breathing, fever, chills, muscle pain, sore throat and loss of taste or smell.[11]

27. COVID-19 is a new disease. The first known outbreak was a cluster of cases of pneumonia in Wuhan, Hubei Province in China in December 2019.[12] The disease did not even have an official name when WHO declared a "Public Health Emergency of International Concern" on January 30, 2020.[13] The disease was given its name by WHO on February 11, 2020, short for "coronavirus disease 2019." [14]

28. After it was discovered, COVID-19 spread rapidly. On March 11, 2020, "[d]eeply concerned both by the alarming levels of spread and severity, and by the alarming levels of inaction, WHO made the assessment that COVID-19 can be characterized as a pandemic."[15]

29. A pandemic is "an outbreak of a disease that occurs over a wide geographic area and affects an exceptionally high proportion of the population."[16] To be classified as a pandemic, WHO requires "the worldwide spread of a new disease."[17]

30. At the point that WHO called COVID-19 a pandemic on March 11, the number of cases outside China in just the past two weeks had increased by 13-fold to 118,000 in 114 countries; more than 4,000 people had lost their lives, and as the Director-General of WHO stated, "[t]housands more [were] fighting for their lives in hospitals."[18]

---

[11] https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (accessed 10/26/2020).
[12] https://www.who.int/news-room/detail/27-04-2020-who-timeline---covid-19 (accessed 10/26/2020).
[13] https://www.who.int/emergencies/diseases/novel-coronavirus-2019/events-as-they-happen (accessed 10/26/2020).
[14] https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200211-sitrep-22-ncov.pdf?sfvrsn=fb6d49b1_2 (accessed 10/26/2020).
[15] https://www.who.int/news-room/detail/27-04-2020-who-timeline---covid-19 (accessed 10/26/2020).
[16] https://www.merriam-webster.com/dictionary/pandemic (accessed 10/26/2020).
[17] https://www.who.int/csr/disease/swineflu/frequently_asked_questions/pandemic/en/ (accessed 10/26/2020).
[18] https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (accessed 10/26/2020).

31. According to the COVID Tracking Project, by that same date, March 11, 2,064 patients had tested positive (confirmed plus probable) in the United States, and 43 patients had died of the disease (confirmed plus probable). From that date on, the number of cases and deaths increased exponentially. By March 17, 2020, less than a week later, the number of cases nationwide had increased approximately 5 times to 10,358, and the number of deaths had increased by approximately three times to 120.[19]

32. As of October 16, 2020, according to the *New York Times*, there were more than 8 million COVID-19 cases in the United States, with 217,000 deaths.[20] That was more than any other country in the world and the 11th highest on a per capita basis in both metrics.[21]

33. Missouri was hit by COVID-19 later than other states, but once it arrived it spread rapidly. As of March 11, 2020, when COVID-19 was first declared a worldwide pandemic, there was only one reported case in Missouri and no deaths. By March 17, there had been eight positive tests and still no deaths. But by April 3, when Gov. Parson issued his "Stay at Home" Order, positive tests had skyrocketed to 2,113 and 19 Missourians had died of the disease. As of November 2, 2020, there had been 194,990 cases, and 3,097 COVID-19 deaths in Missouri.[22]

34. As determined by the COVID Tracking Project, Missouri was lower than the national average or followed national trends for average new cases, current hospitalizations and new deaths per million people until the summer, when it soared above the national averages:

---

[19] https://covidtracking.com/data/us-daily (accessed 10/26/2020).
[20] https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html (accessed 10/16/2020).
[21] *Id.*
[22] https://www.nytimes.com/interactive/2020/us/missouri-coronavirus-cases.html (accessed 11/02/2020).



35. Illinois has also been hard-hit. As of early November, it ranked 10th among the states and the District of Columbia in Deaths per 100,000 residents:[23]

| U.S. Covid in the U.S.: Latest Map and Case Count | TOTAL DEATHS | ▼ PER 100,000 | DAILY AVG. IN LAST 7 DAYS | PER 100,000 | CAPITA |
|---|---|---|---|---|---|
| + New Jersey MAP » | 16,391 | 185 | 9.3 | 0.1 | |
| + New York MAP » | 33,198 | 171 | 15.1 | <0.1 | |
| + Massachusetts MAP » | 10,035 | 146 | 21 | 0.3 | |
| + Connecticut MAP » | 4,635 | 130 | 5.7 | 0.2 | |
| + Louisiana MAP » | 5,975 | 129 | 11.3 | 0.2 | |
| + Rhode Island MAP » | 1,214 | 115 | 3.4 | 0.3 | |
| + Mississippi MAP » | 3,397 | 114 | 14.4 | 0.5 | |
| Washington, D.C. MAP » | 647 | 92 | 0.4 | <0.1 | |
| + Arizona MAP » | 6,059 | 83 | 18.7 | 0.3 | |
| + Illinois MAP » | 10,233 | 81 | 45.3 | 0.4 | |

---

[23] https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (accessed 11/4/2020).

**B.  Steps Taken by Authorities to Control the Pandemic**

36. On March 13, 2020, the White House issued a proclamation declaring "that the COVID-19 outbreak in the United States constitutes a national emergency"; it specified that the emergency had actually begun March 1, 2020.[24]

37. On March 13, Missouri Governor Mike Parson signed an executive order declaring a state of emergency in Missouri due to COVID-19.[25]

38. On April 3, 2020, the Missouri Department of Health and Senior Services issued a "Stay at Home" Order, which did not allow individuals to leave home to visit hair salons. After an extension, that Order remained in effect through May 3, 2020. [26]

39. Orders closing hair salons were put into effect at the County level in Missouri even earlier. For instance, on March 21, 2020, St, Louis County Executive Dr. Sam Page issued an Executive Order commanding the Director of the St. Louis County Department of Public Health to issue an order directing that "people stay home when possible" other than, inter alia, to "perform tasks essential to the health and safety of individuals, their families, their household members, and their pets, such as … visiting a health care professional or hospital …."[27] That order did not allow visits to hair salons. That same day the County Director of Public Health issued an Amended Stay at Home Order that did not allow hair salons to remain open.[28] That order was extended on April 20.[29]

---

[24] https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ (accessed 10/26/2020).

[25] https://governor.mo.gov/press-releases/archive/governor-parson-signs-executive-order-20-02-declaring-state-emergency (accessed 11/3/2020).

[26] https://governor.mo.gov/priorities/stay-home-order (accessed 11/3/2020).

[27] https://stlcorona.com/dr-pages-messages/exec-orders/county-executive-order-15-restrictions-on-activities-to-limit-spread-of-covid-19/ (accessed 11/3/2020) (emphasis added).

[28] https://stlcorona.com/dr-pages-messages/public-health-orders/director-of-public-health-amended-stay-at-home-order/ (accessed 11/3/2020).

[29] https://stlcorona.com/dr-pages-messages/public-health-orders/director-of-public-health-extension-and-amendment-of-stay-at-home-order/ (accessed 11/3/2020).

40. Similarly, as of March 23, 2020, hair salons were ordered closed in the City of St. Louis through April 22, later extended indefinitely. [30]

41. On March 23, 2020, St. Charles County Executive Ehlmann issued an order that every person in the County must remain in their residence or surrounding property except to engage in "(a) activities they deem essential to their physical, mental, and spiritual well-being, or (b) employment …."[31] That ruled out visiting hair salons.

42. St. Louis County, where most of Plaintiff's Missouri salons are located, didn't allow reopening of hair salons and other businesses until May 18.[32]

43. Similar actions were taken in Illinois. On March 20, 2020, Governor Pritzker issued his first stay-at-home order for Illinois.[33] That order did not allow Illinoisans to visit hair salons.

44. That order was later extended through April 30, 2020[34] and on April 30 was extended without an end date.[35]

45. As of May 29, 2020, hair salons and other businesses in Illinois were allowed to reopen so long as they practiced social distancing and adopted other measures such as wearing masks.[36]

**C. The Damaging Impact of the COVID-19 Pandemic on Plaintiff.**

46. As a result of the risks of staying open during the COVID-19 pandemic, as well as government shut-down orders, Plaintiff closed its Missouri and Illinois salons for up to two months beginning March 18-20, 2020. It re-opened five St. Louis salons on May 9, 2020, eight

---

[30] https://www.stlouis-mo.gov/government/departments/health/communicable-disease/covid-19/documents/upload/Health-Commission-s-Order-5-03-21-2020.pdf (accessed 11/3/2020).

[31] https://www.sccmo.org/DocumentCenter/View/15365/20-06-Executive-Order-PDF (accessed 11/3/2020).

[32] https://stlcorona.com/dr-pages-messages/public-health-orders/director-of-public-health-business-and-individual-guidelines-for-social-distancing-and-re-opening/ (accessed 11/3/2020).

[33] Executive Order No. 10, https://www2.illinois.gov/Pages/Executive-Orders/ExecutiveOrder2020-10.aspx (accessed 11/4/2020).

[34] Executive Order No. 18, https://www2.illinois.gov/Pages/Executive-Orders/ExecutiveOrder2020-18.aspx (accessed 11/4/2020).

[35] Executive Order No. 32, https://www2.illinois.gov/Pages/Executive-Orders/ExecutiveOrder2020-32.aspx (accessed 11/4/2020).

[36] Executive Order No. 36, https://www2.illinois.gov/Pages/Executive-Orders/ExecutiveOrder2020-38.aspx (accessed 11/4/2020).

St. Louis salons on May 18, three more on May 26 and May 27 (one of which closed

permanently on June 2), and its Illinois salons on June 3.

47. Even after reopening, Plaintiff continued to sustain losses due to the requirement for

social distancing, which limited the number of patrons it could handle at one time.

48. In addition, after re-opening, Plaintiff has had Extra Expenses because of the need to

purchase such items as Plexiglass dividers, masks and cleaning supplies.

**D.  Plaintiff's Business Insurance Policies with Defendant**

49. In exchange for premiums paid by Plaintiff to Defendant, Plaintiff obtained a

Commercial lines Policy from Defendant for a short period from February 28, 2020 to July 5,

2020 (Ex. A at 2), which was renewed with a Commercial Lines Policy for the period from July

5, 2020, to July 5, 2021. Ex. B. at 20 (all page numbers in citations to this exhibit refer to the

page of the pdf, including the cover page). Those policies are collectively referred to herein as

"the Policy"). The named insured is Gateway Clippers Holdings, LLC, at 165 N. Meramec Ave.,

Ste 500, Saint Louis, MO 63105. Ex. A at 2; Ex. B at 2.

50. The Policy contains a Businessowners Special Property Coverage Form (Ex. A at 50 ff;

Ex. B at 56 ff), which includes "Additional Coverage" for Business Income and Extra Expense.

The provision for that coverage states:

> We will pay for the actual loss of Business Income you sustain due to the
> necessary suspension of your "operations" during the "period of restoration". The
> "suspension" must be caused by *direct physical loss of* or damage to property at
> the described premises. The loss or damage must be caused by or result from a
> Covered Cause of Loss.

Ex. A at 53; Ex. B at 59 (emphasis added).

51. The described premises are Gateway's Missouri and Illinois salons. Ex. A at 67; Ex. B at

22-23.

52. Although some terms in the policy are defined, Defendant chose not to define "direct physical loss of or damage to property" in the coverage for loss of Business Income. Thus, those words must be given their plain and ordinary meaning, consistent with the expectations of the policyholder.

53. In the phrase "direct physical loss of or damage to property," "loss" is used as an alternative to "damage." Thus, there is coverage for both "loss of property" and "damage to property."

54. "Loss of property" can be reasonably read as being deprived of the use of property, while "damage" can refer to a reduction in a property's functionality.

55. Using a grammatical reading of the phrase "direct physical loss of or damage to property," the words "direct" and "physical" can be reasonably construed as modifying only the word "loss" and not "damage." If West Bend had intended "direct" and "physical" to modify "damage," it should have and would have said "direct physical loss of property or direct physical damage to property." In fact, there are commercial insurance policies that say just that, "direct physical loss or direct physical damage." To the extent that language in this policy is ambiguous, it must be construed against Defendant. Thus, while "loss" must be direct and physical, "damage" need not be.

56. The COVID-19 pandemic caused a direct physical loss of Gateway's property at the described premises by directly denying Plaintiff the ability to physically access and use the property in the normal fashion in its business and denying Gateway's customers the ability to access and use the property for salon services; it is therefore a covered loss.

57. Because "damage" need not be "direct" or "physical" to be covered, it can be indirect and non-physical – *i.e.*, intangible. Plaintiff suffered such intangible damage – a reduction in the property's functionality – as a result of the COVID-19 pandemic.

58. The Policy defines Business Income as the:

(i)  Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of Continuing normal operating expenses incurred, including payroll ….

Ex. A at 53; Ex. B at 59.

59. The Additional Coverage for Business Income also covers Extended Business Income for losses that occur after the property is restored, as follows:

If the under this policy, we will pay for the actual loss of Business Income you incur during the period that:

necessary suspension of your "operations" produces a Business Income loss payable (a) Begins on the date property except finished stock is actually repaired, rebuilt or replaced and 'operations' are resumed; and

(b) Ends on the earlier of:

(i) The date you could restore your "operations", with reasonable speed, to the level which would generate the business income amount that would have existed if no direct physical loss or damage had occurred; or

(ii) 180 consecutive days after the date determined in Paragraph (a)(1) above.

However, Extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of Business Income must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

Ex. A at 53; Ex. B at 59.

60. The policy defines "operations" as "your business activities occurring at the described premises." Ex. A at 89; Ex. B at 98.

14

61. The policy does not define "suspension" for purposes of the Additional Coverage for Business Income. Thus, that word must be given its plain and ordinary meaning, consistent with the expectations of the policyholder. Suspension means "temporary stoppage."[37] Thus, the Additional Coverage for Business Income covers loss of Business during a temporary stoppage of the policyholder's business operations at the described premises.

62. The Additional Coverage for Business Income provides for coverage during the "period of restoration"; it defines "period of restoration" as follows:

"Period of restoration" means the period of time that:

a. Begins with the date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises; and

b. Ends on the earlier of:

(1) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

(2) The date when business is resumed at a new permanent location.

Ex. A at 89; Ex. B at 98.

63. The Policy does not define "repaired" or "repair." Thus, that word must be given its plain and ordinary meaning, consistent with the expectations of the policyholder. According to the Merriam-Webster Dictionary, "repair" means "to restore to a sound or healthy state."[38]

64. Plaintiff's "period of restoration" therefore began on the date it had to close each salon because of the risk of keeping it open during the COVID-19 pandemic. It ended for each salon when that salon re-opened after Gateway took measures to restore the salon to a healthy state by purchasing protective equipment and instituting procedures for social distancing.

---

[37] https://www.vocabulary.com/dictionary/suspension (accessed 11/5/2020).
[38] https://www.merriam-webster.com/dictionary/repair (accessed 10/30/2020).

65. The Policy also contains Additional Coverage for Extra Expense. This coverage covers "the necessary Extra Expense you incur during the 'period of restoration' that you would not have incurred if there had been no direct physical loss or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss." Ex. A at 560; Ex. B at 68.

66. Extra Expense is defined, in pertinent part, as "expense incurred: (i) To avoid or minimize the suspension of business and to continue 'operations': 1. At the described premises ...." Ex. A at 60-61; Ex. B at 68 (paragraphing omitted).

67. For Extra Expense coverage, "Suspension" means "[t]he partial slowdown or complete cessation of your business activities ...." Ex. A at 61; Ex. B at 69. This definition applies to Plaintiff's Extra Expense because, as a result of the COVID-19 pandemic, its business activities partially slowed down or ceased.

68. The phrase "period of restoration" and the word "operations" in the Additional Coverage for Extra Expense has the same definition set forth above.

69. The Businessowners Special Property Coverage Form contains an Additional Coverage called, "Civil Authority." That provision states:

> When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, provided that both of the following apply.
>
> > (1) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and
> >
> > (2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

16

Civil Authority Coverage for necessary Business Income and Extra Expense will begin immediately after the time of the first action of civil authority that prohibits access to the described premises and will apply for a period of up to four consecutive weeks from the date on which such coverage began.

The definitions of Business Income and Extra Expense contained in the Business Income and Extra Expense Additional Coverages also apply to this Civil Authority Additional Coverage. The Civil Authority Additional Coverage is not subject to the Limits of Insurance

Ex. A at 55-56; Ex. B at 61-62.

70. Plaintiff has coverage under that provision because the coronavirus caused damage to property other than at the described premises (the premises of Plaintiff's salons) and civil authorities prohibited access to those premises, and in addition both of the conditions apply.

71. As noted above, the Business Income and Extra Expense provisions provide that "loss or damage must be caused by or result from a Covered Cause of Loss." Because the phrase "Covered Cause of Loss" is not in quote marks, it is not a specially defined term.

72. The Policy provides that "Covered Causes of Loss" are "[d]irect physical loss unless the loss is excluded or limited." Ex. A at 51, Ex. B at 57.

73. There was a direct physical loss of the property as described above.

74. None of the referenced Exclusions or Limitations apply to Plaintiff's losses.

75. The Policy has a so-called Virus Exclusion, contained in Subparagraph 2 of the Exclusions in Businessowners Special Property Coverage Form. That Exclusion provides in pertinent part:

2. We will not pay for loss or damage caused by or resulting from any of the following:

*** 

*l.* **Virus or Bacteria**

(1) Any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

17

Ex. A at 79, 81; Ex. B at 88 90.

76. Specifically, this is a Subparagraph 2 exclusion that only applies where the matter excluded does not cause the loss indirectly and is the sole cause of the loss.

77. That exclusion does not apply to Plaintiff's loss because that loss was not directly caused by a virus with no other cause. There is no evidence that the virus has ever been in Plaintiff's premises. Plaintiff's loss was caused by the disease COVID-19, the COVID-19 pandemic and the precautionary measures taken by federal, state and local officials to prevent its spread.

78. Defendant could have employed broader causation language in the Virus Exclusion and thereby excluded Plaintiff's losses due to the pandemic. It does use such language elsewhere in the Policy, but not in the Virus Exclusion.

79. For example, as opposed to Subparagraph 2, Subparagraph 1 of the Exclusion provision in the Businessowners Special Property Coverage Form contains several Exclusions that apply where the item excluded causes loss or damage *directly or indirectly and regardless of any other cause or event that contributes concurrently or in any sequence to the loss*. It states:

**B. Exclusions**

1. We will not pay for loss or damage caused directly *or indirectly* by any of the following. Such loss or damage is excluded *regardless of any other cause or event that contributes concurrently or in any sequence to the loss*.

Ex. A at 78; Ex. B at 87 (emphasis added).

80. For Subparagraph 2 exclusions, including the Virus Exclusion, however, West Bend elected to use the more restrictive causation language, "caused by or resulting from," rather than "caused directly or indirectly." Therefore, the Virus Exclusion does not apply if the virus causes the loss indirectly. Here, the causal relationship between the coronavirus to Plaintiff's losses is

indirect in that the virus caused COVID-19, which led to the pandemic, which caused Plaintiff to close its premises.

81. Nor, unlike Subparagraph 1 exclusions, does the Virus Exclusion apply if there is any other cause or event that contributes concurrently or in any sequence to the loss. Here, another cause – indeed, the primary cause – is the COVID-19 pandemic. Yet another cause is the government closure orders.

82. The following screenshots show the differences between these two types of exclusions:[39]

| Subparagraph 1 Exclusions | Subparagraph 2 Exclusions (*e.g.*, virus) |
|---|---|
| 1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss | 2. We will not pay for loss or damage caused by or resulting from any of the following: |

"directly or indirectly"

"regardless of any other cause or event"

No mention of "indirectly" or other cause

It could not be clearer that the Virus Exclusion does not apply if a virus causes a loss indirectly or where there is another cause.

83. Furthermore, even if the Virus Exclusion were applicable to the losses of Plaintiff and Class members, under the principles of regulatory estoppel and general public policy, Defendant should be estopped from enforcing it.

84. Specifically, in 2006, two insurance industry trade groups, the ISO and the American Association of Insurance Services ("AAIS"), represented hundreds of insurers in a national effort to seek approval from state insurance regulators for the adoption of the Virus Exclusion.

---

[39] Ex. A at 78-79; Ex. B at 87, 88.

85. In filings with state regulators, ISO and AAIS, on behalf of insurers, represented that the adoption of the Virus Exclusion was only meant to "clarify" that coverage for "disease-causing agents" has never been in effect, and was never intended to be included, in the property policies.

86. In a July 6, 2006, "ISO Circular" entitled "New Endorsements Filed to Address Exclusion of Loss Due to Virus or Bacteria," ISO represented to the state regulatory bodies:

> While property polices have not been a source of recovery for losses involving contamination by disease-causing agents, the spector of pandemic or hitherto unorthodox transmission of infectious material raises the concern that insurers employing such polices may face claims in which there are efforts to expand coverage to create sources of recovery for such losses, contrary to policy intent.

87. Similarly, AAIS, in its "Filing Memorandum" in support of the Virus Exclusion, represented:

> Property policies have not been, nor were they intended to be, a source of recovery for loss, cost or expense caused by disease causing agents. With the possibility of a pandemic, there is concern that claims may result in efforts to expand coverage to create recovery for loss where no coverage was originally intended . . .

88. This endorsement clarifies that loss, cost, or expense caused by, resulting from, or relating to any virus, bacterium, or other microorganism that causes disease, illness, or physical distress or that is capable of causing disease, illness, or physical distress is excluded…

89. These representations made by the insurance industry were false.

90. By 2006, the time of the state applications to approve the Virus Exclusion, courts had repeatedly found that property insurance policies covered claims involving disease-causing agents, and had held on numerous occasions that any condition making it impossible to use property for its intended use constituted "physical loss or damage to such property."

91. Upon information and belief, the state insurance departments relied on the industry's and Defendant's representation in approving the Virus Exclusion for inclusion in standard comprehensive policies without a reduction in premiums to balance a reduction in coverage.

92. The assertions made by the insurance industry and Defendant to obtain regulatory approval of the Virus Exclusion were misrepresentations and for this reason, among other public policy concerns, Defendant should be estopped from enforcing the Virus Exclusion to avoid coverage of claims related to the COVID-19 pandemic.

93. In securing approval for the adoption of the Virus Exclusion by misrepresenting to the state regulators that the Virus Exclusion would not change the scope of coverage, Defendant effectively narrowed the scope of the insuring agreement without a commensurate reduction in premiums charged.

94. Under the doctrine of regulatory estoppel, the Court should not permit Defendant to benefit from this type of duplicitous conduct before the state regulators.

95. For the above reasons, Plaintiff is entitled to coverage under the above provisions of The Policy.

**E. Defendant's Efforts to Discourage Insureds from Making Claims Despite Knowing That It Will Have to Pay Them and Its Denial of Plaintiff's Claim**

96. Defendant has two pages on its website devoted to COVID-19. Neither acknowledges that business income losses caused by the pandemic are covered by its policies and therefore it misleads policyholders and is apparently part of a strategy to discourage claims for such losses.

97. On a page titled "COVID-19 Resources," West Bend recognizes that "[w]ith forced closings, many business owners are looking for ways to keep their businesses afloat." But rather than tell policyholders that they should submit claims to it for coverage, it includes only links to external pages, such as a page related to the PPP loan program[40]:

---

[40] https://www.thesilverlining.com/covid-19 (accessed 11/6/2020).



98.  A more direct and honest way to tell policyholders about how they could keep their businesses afloat would have been to tell them to submit insurance claims. Defendant chose not to do that.

99.  Defendant also has a page entitled, West Bend's Response to COVID-19. That page even has a section titled, "Payments made to some business policyholders." Alas, that heading is only a teaser. The payments do not include payment of insurance claims, but partial refunds to some business policyholders. The page even boasts that "West Bend remains committed to our policyholders" with "industry-leading claim service" – but not committed enough to honor COVID-19 business loss claims. It proclaims that it is dedicated to providing "The Silver Lining®,"  which it has apparently registered as an advertising trademark, but not a way of doing business:[41]

---

[41] https://www.thesilverlining.com/covid-19-west-bend-response (accessed 11/6/2020).



100. Plaintiff does not know who, if anyone, received one of these refunds, but Plaintiff did not. The refunds may have been meager gestures of as little as $50 that went to holders of a type of policy called SMARTbusiness.[42] Plaintiff does not have that type of policy.

101. Despite Defendant's apparent strategy to discourage claims, Plaintiff, through counsel, made a claim on its policy by email to defendant on September 23, 2020, and asked that West Bend acknowledge coverage and respond by September 30, 2020. Ex. C.

102. West Bend acknowledged receipt of the claim by letter dated September 28, 2020 (Ex. D) and then denied the claim by letter dated October 8, 2020. Ex. E.

103. West Bend offered several reasons for denying the claim that are all based on obvious misinterpretations of the Policy.

104. First, even though the Policy provides coverage for "direct physical loss **of** or damage to property" (emphasis added), West Bend ignored the critical word "of" and stated: "Since there is no direct physical loss or damage to property at the described premises from this loss, the above coverage would not apply." Ex. E at 3. As shown above, there was a "loss of" property, which

---

[42] *See* https://www.theinsurancealliancenetwork.com/covid19-resources#WestBend (accessed 11/6/2020).

occurs when an insured or its customers cannot access or use its property. Defendant also failed to acknowledge that the Policy covers non-direct, non-physical damage to property, as shown above.

105. Defendant also denied coverage under the Civil Authority provision on the same invalid ground; in addition, without even mentioning the Stay at Home Orders, it stated that "there appears to be no prohibition of access to the area immediately surrounding the property." *Id.* at 3.

106. Defendant also claimed that the Virus Exclusion barred coverage but in so doing betrayed an utter lack of understanding of the difference between the virus that causes the COVID-19 disease and the disease itself. It stated: "Since COVID-19 is a virus (and is the cause of the business interruption), this exclusion would apply to both Additional Coverages listed above, and there would be no coverage for the loss …." *Id.* at 4.

107. The only true part of that statement is that Plaintiff's business interruption was caused by COVID-19. As even the barest investigation would have revealed, COVID-19 is not a virus. It is an illness or disease caused by a virus, as the United States Food & Drug Administration states on a page of Frequently Asked Questions:[43]



---

[43] https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/covid-19-frequently-asked-questions (accessed 10/15/2020).

108. The World Health Organization shows the same thing on its web page titled, "Naming the coronavirus disease (COVID-19) and the virus that causes it." As it states, COVID-19 is a disease, not a virus:[44]



109. And, in case anyone still couldn't understand, on that same page WHO explains *why* the virus and the disease have different names. That explanation is, in part[45]:

---

[44] https://www.who.int/emergencies/diseases/novel-coronavirus-2019/technical-guidance/naming-the-coronavirus-disease-(covid-2019)-and-the-virus-that-causes-it (accessed 11/6/2020).
[45] *Id.*



110. In rejecting Plaintiff's claim under the Virus Exclusion, Defendant was apparently under the misapprehension – presumably caused by the lack of an adequate investigation – that COVID-19 is a virus and therefore that Plaintiff's claim for losses was a claim for losses directly caused by a virus without any other cause. But, in fact, Plaintiff's losses were caused by the closure orders and a pandemic of a disease, and only indirectly by a virus.

111. As such, Defendant refused to pay Plaintiff's claim without reasonable cause or excuse and is therefore guilty of a vexatious refusal to pay under Mo. Rev. Stat. §§ 375.296 and 375.420.

### V.  JURY DEMAND

112. Plaintiff demands a trial by jury on all claims so triable.

### COUNT I: BUSINESS INCOME BREACH OF CONTRACT

113. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

114. The Policy issued by Defendant to Plaintiff is an insurance contract under which Defendant was paid premiums in exchange for promises to pay Plaintiff's losses for claims covered by The Policy.

115. In The Policy, Defendant expressly agrees to pay for losses of Business Income incurred as a result of causes not excluded under The Policy, including losses caused by the COVID-19 pandemic. Specifically, Defendant promises to pay for losses of Business Income (including Extended Business Income) sustained as a result of a business suspension.

116. A covered loss has resulted in business suspensions, which have caused Plaintiff lost Business Income and Extended Business Income.

117. The business suspensions and losses triggered the Business Income and Extended Business Income coverage under The Policy.

118. Plaintiff has complied with all applicable provisions of The Policy, including payment of premiums.

119. Defendant, without justification, has refused performance under The Policy by denying coverage for these losses. Accordingly, Defendant is in breach of The Policy.

120. Due to Defendant's breach of The Policy, Plaintiff has suffered actual and substantial damages for which Defendant is liable, in an amount to be proved at trial.

**COUNT II: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING APPLICABLE TO BUSINESS INCOME**

121. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

122. Defendant has breached the duty of good faith and fair dealing owed to Plaintiff in the following respects:

a.  Unreasonably acting or failing to act in a manner that deprives Plaintiff of the benefits of its Policy;

b.  Unreasonably engaging in a pattern and practice of acting or failing to act in a manner that deprives Plaintiff of the benefits of its Policy;

c.  Unreasonably failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of Plaintiff's claims;

d.  Unreasonably engaging in a pattern and practice of failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of claims made under Plaintiff's Policy;

e.  Unreasonably failing to diligently search for and consider evidence that supports coverage of Plaintiff's claims;

f.  Unreasonably engaging in a pattern and practice of failing to diligently search for and consider evidence that supports coverage of Plaintiff's claims;

g.  Unreasonably failing to conduct an investigation to determine the efficient proximate cause (predominant cause) of Plaintiff's losses;

h.  Unreasonably engaging in a pattern and practice of failing to conduct an investigation to determine the efficient proximate cause (predominant cause) on claims made by insureds;

i.  Unreasonably failing to give at least as much consideration to the interests of Plaintiff as it gives to its own interests;

j.  Unreasonably engaging in a pattern and practice of failing to give at least as much consideration to the interests of its insureds as it gives to its own interests;

k.  Unreasonably placing its own financial interests above the interests of Plaintiff; and

l.  Unreasonably engaging in a pattern and practice of placing its own financial interests above the interests of its insureds.

123. By acting in the aforementioned way, Defendant breached the implied covenant of good faith and fair dealing.

124. As a result of this breach, Plaintiff has been damaged in an amount to be proven at trial.

**COUNT III: DECLARATORY RELIEF IN CONNECTION WITH BUSINESS INCOME**

125. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

126. This Court has jurisdiction to declare the rights and other legal relations pursuant to 28 U.S.C. §§ 2201-2202.

127. Plaintiff's Policy is an insurance contract under which Defendant was paid premiums in exchange for promises to pay its losses for claims covered by The Policy.

128. In The Policy, Defendant expressly agrees to pay for loss of Business Income and Extended Business Income incurred as a result of the causes not excluded under The Policy. Specifically, Defendant promised to pay for losses of business income and extended business income sustained as a result of a business suspension.

129. A covered loss has resulted in business suspensions, which has caused Plaintiff losses.

130. The business suspensions and losses triggered the Business Income and Extended Business Income coverage under The Policy.

131. Plaintiff has complied with all applicable provisions of The Policy, including payment of premiums.

132. Defendant, without justification, has refused performance under The Policy by denying coverage for these losses and expenses. Accordingly, Defendant is in breach of The Policy.

133. Plaintiff seeks a judicial determination of whether The Policy provides coverage for Plaintiff's losses.

134. An actual case or controversy exists regarding Plaintiff's rights and Defendant's obligations under the terms of The Policy.

29

## COUNT IV: EXTRA EXPENSE BREACH OF CONTRACT

135. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

136. Plaintiff's Policy is an insurance contract under which Defendant was paid premiums in exchange for promises to pay Plaintiff's losses for claims covered by The Policy.

137. In The Policy, Defendant expressly agrees to pay for extra expenses incurred as a result of the causes not excluded under The Policy. Specifically, Defendant promises to pay amounts to avoid or minimize the losses from suspension of business and to continue "operations" at Plaintiff's premises, to repair or replace any property, and other expenses.

138. A covered loss has resulted in business suspensions. These suspensions have caused Plaintiff to incur extra expenses.

139. The extra expenses triggered the Extra Expense Coverage under The Policy

140. Plaintiff has complied with all applicable provisions of its Policy, including payment of premiums.

141. Defendant, without justification, has refused performance under The Policy by denying coverage for these losses and expenses. Accordingly, Defendant is in breach of The Policy.

142. Due to Defendant's breach of The Policy, Plaintiff has suffered actual and substantial damages for which Defendant is liable, in an amount to be proved at trial.

## COUNT V: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING IN CONNECTION WITH EXTRA EXPENSE COVERAGE

143. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

144. Defendant has breached the duty of good faith and fair dealing owed to Plaintiff with respect to the Extra Expense provisions in the following respects:

    a. Unreasonably acting or failing to act in a manner that deprives Plaintiff the benefits of its Policy;

    b. Unreasonably engaging in a pattern and practice of acting or failing to act in a manner that deprives Plaintiff of the benefits of its Policy;

    c. Unreasonably failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of Plaintiff's claims;

    d. Unreasonably engaging in a pattern and practice of failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of claims made under Plaintiff's Policy;

    e. Unreasonably failing to diligently search for and consider evidence that supports coverage of Plaintiff's claims;

    f. Unreasonably engaging in a pattern and practice of failing to diligently search for and consider evidence that supports coverage of Plaintiff's claims;

    g. Unreasonably failing to conduct an investigation to determine the efficient proximate cause (predominant cause) of Plaintiff's losses;

    h. Unreasonably engaging in a pattern and practice of failing to conduct an investigation to determine the efficient proximate cause (predominant cause) on claims made by insureds;

    i. Unreasonably failing to give at least as much consideration to the interests of Plaintiff as it gives to its own interests;

    j. Unreasonably engaging in a pattern and practice of failing to give at least as much consideration to the interests of its insureds as it gives to its own interests;

    k. Unreasonably placing its own financial interests above the interests of Plaintiff; and

    l. Unreasonably engaging in a pattern and practice of placing its own financial interests above the interests of its insureds.

145. By acting in the aforementioned way, Defendant breached the implied covenant of good faith and fair dealing with respect to the Extra Expense provisions of The Policy.

146. As a result of this breach, Plaintiff has been damaged in an amount to be proven at trial.

## COUNT VI: DECLARATORY RELIEF IN CONNECTION WITH EXTRA EXPENSE COVERAGE

147. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

148. This Court has jurisdiction to declare the rights and other legal relations pursuant to 28 U.S.C. §§ 2201-2202.

149. Plaintiff's Policy is an insurance contract under which Defendant was paid premiums in exchange for promises to pay Plaintiff's claims covered by The Policy.

150. In The Policy, Defendant expressly agrees to pay extra expenses incurred as a result of the causes not excluded under The Policy. Specifically, Defendant promises to pay amounts to avoid or minimize the losses from suspension of business and to continue "operations" at Plaintiff's premises, to repair or replace any property, and other expenses.

151. A covered loss has resulted in business suspensions, which has caused Plaintiff losses.

152. These covered losses have resulted, and will result, in extra expenses, which has caused Plaintiff's losses.

153. The extra expenses triggered the Extra Expense Coverage under The Policy.

154. Plaintiff has complied with all applicable provisions of The Policy, including payment of premiums.

155. Defendant, without justification, has refused performance under The Policy by denying coverage for these losses and expenses. Accordingly, Defendant is in breach of The Policy.

156. Plaintiff seeks a judicial determination of whether the Extra Expense provisions of The Policy provides coverage for Plaintiff's losses.

157. An actual case or controversy exists regarding Plaintiff's rights and Defendant's obligations under the terms of the Extra Expense provisions of Plaintiff's Policy.

## COUNT VII: CIVIL AUTHORITY BREACH OF CONTRACT

158. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

159. The Policy issued by Defendant to Plaintiff is an insurance contract under which Defendant was paid premiums in exchange for promises to pay Plaintiff's losses for claims covered by The Policy.

160. In The Policy, Defendant expressly agrees to pay for losses caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss.

161. Plaintiff has sustained such losses as set forth above.

162. Plaintiff has complied with all applicable provisions of The Policy, including payment of premiums.

163. Defendant, without justification, has refused performance under The Policy by denying coverage for these losses. Accordingly, Defendant is in breach of The Policy.

164. Due to Defendant's breach of The Policy, Plaintiff has suffered actual and substantial damages for which Defendant is liable, in an amount to be proved at trial.

## COUNT VIII: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING APPLICABLE TO CIVIL AUTHORITY COVERAGE

165. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

166. Defendant has breached the duty of good faith and fair dealing owed to Plaintiff in the following respects in connection with the Policy's Civil Authority coverage:

    a.   Unreasonably acting or failing to act in a manner that deprives Plaintiff of the benefits of its Policy;

    b.   Unreasonably engaging in a pattern and practice of acting or failing to act in a manner that deprives Plaintiff of the benefits of its Policy;

    c.   Unreasonably failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of Plaintiff's claims;

    d.   Unreasonably engaging in a pattern and practice of failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of claims made under Plaintiff's Policy;

    e.   Unreasonably failing to diligently search for and consider evidence that supports coverage of Plaintiff's claims;

    f.   Unreasonably engaging in a pattern and practice of failing to diligently search for and consider evidence that supports coverage of Plaintiff's claims;

    g.   Unreasonably failing to conduct an investigation to determine the efficient proximate cause (predominant cause) of Plaintiff's losses;

    h.   Unreasonably engaging in a pattern and practice of failing to conduct an investigation to determine the efficient proximate cause (predominant cause) on claims made by insureds;

    i.   Unreasonably failing to give at least as much consideration to the interests of Plaintiff as it gives to its own interests;

    j.   Unreasonably engaging in a pattern and practice of failing to give at least as much consideration to the interests of its insureds as it gives to its own interests;

    k.   Unreasonably placing its own financial interests above the interests of Plaintiff; and

34

l.  Unreasonably engaging in a pattern and practice of placing its own financial interests above the interests of its insureds.

167. By acting in the aforementioned way, Defendant breached the implied covenant of good faith and fair dealing.

168. As a result of this breach, Plaintiff has been damaged in an amount to be proven at trial.

## COUNT IX: DECLARATORY RELIEF IN CONNECTION WITH CIVIL AUTHORITY COVERAGE

169. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

170. This Court has jurisdiction to declare the rights and other legal relations pursuant to 28 U.S.C. §§ 2201-2202.

171. Plaintiff's Policy is an insurance contract under which Defendant was paid premiums in exchange for promises to pay its losses for claims covered by The Policy.

172. In The Policy, Defendant expressly agrees to pay for loss under the Civil Authority provision. Specifically, Defendant promises to pay for losses caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss.

173. A covered loss has resulted in business suspensions, which has caused Plaintiff losses.

174. The business suspensions and losses triggered the Civil Authority coverage under The Policy.

175. Plaintiff has complied with all applicable provisions of The Policy, including payment of premiums.

35

176. Defendant, without justification, has refused performance under The Policy by denying coverage for these losses and expenses. Accordingly, Defendant is in breach of The Policy.

177. Plaintiff seeks a judicial determination of whether The Policy provides coverage for Plaintiff's losses.

178. An actual case or controversy exists regarding Plaintiff's rights and Defendant's obligations under the terms of The Policy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendant, as follows:

1. A judicial declaration declaring the meaning of the provisions of The Policy concerning the business income coverage and extra expense coverage;

2. An award of damages to Plaintiff in an amount to be determined at trial.

3. An award of damages and attorneys' fees for vexatious refusal to pay under §§ 375.296 and 375.420.

4. An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded, as allowed by law;

5. An award of costs as allowed by law; and

6. Such other or further relief as may be appropriate.

Dated: November 25, 2020         Respectfully submitted,

**LAW OFFICE OF RICHARD S. CORNFELD, LLC**
By:  */s/ Richard S. Cornfeld*
      Richard S. Cornfeld, #31046MO
      Daniel S. Levy, #66039MO
      1010 Market Street, Suite 1645
      St. Louis, Missouri 63101
      P. 314-241-5799
      F. 314-241-5788
      rcornfeld@cornfeldlegal.com

dlevy@cornfeldlegal.com

And

Anthony S. Bruning, #30906MO
Anthony S. Bruning, Jr., #60200MO
Ryan L. Bruning, #62773MO
THE BRUNING LAW FIRM, LLC
555 Washington Avenue, Suite 600
St. Louis, Missouri 63101
P. 314-735-8100 / F. 314-898-3078
tony@bruninglegal.com
aj@bruninglegal.com
ryan@bruninglegal.com

And

Alfredo Torrijos (*Pro Hac Vice*)
ARIAS SANGUINETTI WANG & TORRIJOS, LLP
6701 Center Drive West, 14th Floor
Los Angeles, CA
T: (310) 844-9696
F: (310) 861-0168
alfredo@aswtlawyers.com

And

Mark C. Goldenberg, #43155MO
Thomas P. Rosenfeld #35305MO
Kevin P. Green #63497MO
GOLDENBERG HELLER
2227 South State Route 157
Edwardsville, IL 62025
618-656-5150
mark@ghalaw.com
tom@ghalaw.com
kevin@ghalaw.com


***Attorneys for Plaintiff***